2-23-0576-WC, Lynn Spencer, Appellant by Kurt Nearman v. Illinois Workers' Compensation Comm'n et al., Illinois Central School Bus, LLC, Appley, by Robert Newman. Mr. Nearman, you may proceed. Thank you, Justice Holdridge. Kurt Nearman, on behalf of and proudly representing Lynn Spencer, may I please the Court of Counsel? Three points to discuss with you today. Number one, the Commission decision wasn't against the manifest way to the evidence, not even close to it. A-4 is where you'll find the decision. A-4, the Commission tells us why they awarded the case unanimously in favor of Ms. Spencer. Basing on her testimony, witnesses saw the bump on her head. We have liquid urine on the bus despite days of below zero temps. She consistently reported the event to all providers, the IMEs, and at trial. That's what they based their reversal on, gave her a unanimous award. In response, Illinois Central presented circumstantial evidence. None of its witnesses contradicted a single detail of Ms. Spencer's testimony because nobody was there. None of them knew if an attacker was on the bus by their own admission. None of them knew how long it was before they even got going in whatever they testified that they did that day. Most of them didn't even remember whether they were there or what they did that day. The DVR, the digital video recording, was a red herring. It couldn't have captured anything of relevance. No testimony was presented about anyone monitoring lots. No testimony was presented about anyone actually tracking footprints in the snow or whether snow was even there. We have a barely lit area, no security to protect the lot. We have doors left open at night. We have a homeless encampment across the street or right next to this lot. We have below zero attempts for multiple days. It's a logical place where people would go and they have evidence of people sleeping on those buses at night. So given the manifest weight standard, which you tell me applies to these cases and how it applies to these cases, the commission is the ultimate decision maker in the cases. They find fact, causation, they decide credibility of witness, they resolve conflicts. So the only way that it can be reversed by the circuit court is if an opposite conclusion is clearly apparent when no rational trier of fact would have agreed with the agency. I have a unanimous decision from the commission. It's completely logical. It makes sense. They brought in circumstantial evidence, which didn't prove anything. So Ms. Spencer is entitled to at least a win on accident and causation. Do you have any questions about point one? Because I can, I got two other points to move on to. Well, excuse me if I have the facts wrong, Mr. Newman, but what I understood about the cameras is, and I guess the main feature that I think would be relevant to your point of view is that the camera went off after it timed off after a certain amount of time. And I, what I understood is it's your contention. That's why there's nothing on the video because at that point it had timed out and until the bus was turned back on, it wasn't going to record anything. Do I have that wrong? That's true. That's true. All that evidence came from their witnesses. What happens is either the DVR kicks in when you turn the ignition or you turn the bus on and that's a little dispute, but it doesn't turn on until five minutes after you fire up the ignition or turn on the interior stuff. So it couldn't have caught the attack if she turned it on, right? And before that, if they started the buses that morning at 3.30, when they're supposed to go out and start these buses, it would have kicked off by 4.45. The attack didn't happen for another 45 minutes at the earliest. There's no possible way it could have caught anyone attacking her, leaving the bus or anything else. So, yes, you're exactly right, Justice Mullen. Thank you. Okay. Point two? Continue. Okay. Point two. Assuming that you're going to reinstate the commission findings on accident and causation, Ms. Spencer proved up everything she could possibly need to prove up to win a permanent total disability award rather than a person as a whole award. We presented expert testimony, as we're required to do by Weston, who proved that due to the age, skills, training, work history, and injuries, she will not be regularly employed in a well-known branch of the labor market. Look at the commission findings. I mean, they even believed it because what the commission findings said, and this is at A7 attached to my brief, her psychological, her related psychological condition and unrelated physical conditions and age weigh heavily against her return to the workforce. Well, if her package, her presentation to prospective employers weighs heavily against her ability to return to a workforce, that's what you need to prove up to prove up permanent total disability benefits. The second thing they found at A7, again, having to cope with permanent mental health injury to PTSD and health conditions associated with her advanced age, she will likely have more difficulty performing her job or finding alternative employment than a younger person. And then the one that I think really kills it off, it's on A8, A8 of the commission decision. She continues to suffer the ill effects of her work-related PTSD, and these will impact her ability to perform any regular employment, okay? Those are findings made by the commission. Any of those findings have to trigger an entitlement to permanent total disability benefits as a matter of law, because we accept that those are good findings. And so it's a question of how the law applies to the findings. And if you're finding she's weighs heavily against her returning to the workforce, she's not going to be able to perform any type of employment, she's entitled to permanent total disability benefits. There's nothing else that needs to be proven under the case law. So that's point two. And if nobody... There was a suggestion, though, that she would have been available or able to work at home doing remote work. How does the PTSD get brought in in that scenario? Well, Justice, I think that the standard is once I've made my proofs, they have to present something showing she's regularly employable in a well-known branch of the market, right? So can work at home. They didn't produce evidence that there was a branch of the market out there for her, or that a single job existed that she could fit herself into. And Illinois Central prevented her from providing the services she claimed she could offer to my client to find her employment. So Illinois Central sabotaged my client's ability to get the job if there was a job out there, which we don't even believe because they didn't identify any job or do a labor market survey or anything else. So I think she's entitled to a permanent total, Justice Barbaros. And I take your point completely, but they didn't make the proofs on it. Well, and there was also the testimony that even though she had worked as an office manager, office worker, that her skills in that regard were not up to date because she hadn't done it in over eight or 10 years, right? 15, I believe. Yeah, you're exactly right. Yeah, you're exactly right. And that was a big factor in my expert's testimony that she wasn't able to do anything. So it was unemployable. And now she's 81. I think she's 81. So point three, guys? Please. Okay, thank you. So last point, and I think this is kind of an important point, and I know it's a challenging one possibly for you, if anything's challenging for you guys. Every conceivable form of penalties and fees should be assessed against Illinois Central in this case for multiple reasons. Failure to award or the award of penalties is reviewed under an abuse of discretion standard. That standard can be breached or broached whenever we can prove no reasonable person would agree with the commission decision on penalties, the denial of penalties in this case, or the decision's fanciful, arbitrary, and unreasonable. Now, in the past, in the Oliver case, Oliver versus Illinois District Commission, as well as in the McDonald's case that you recently handed down in 2015, I think, disputes were made over frivolous notices. The employer made a frivolous notice defense dispute, and those were justifications for imposing penalties on the company. And I think the Oliver versus commission case actually went to the point of saying, we determine this whether or not there's just simple inadvertence or neglect in the way that the employer is conducting itself and denying and mishandling the case. So in this case, we have nine years at this point of truly unusual defense behavior. We've destroyed the DVR footage, which Illinois Central guaranteed the police officer they would maintain for the purposes of the investigation. So they destroyed the footage, so we can't see it. They misled their own IMEs to manufacture disputes on the case, which I think is common in workers' count, but it's really over the top in this case. Even when IME Schlageter in his report said her condition is causally related to the attack, they didn't back up and start paying benefits or authorizing treatment, meaning they were never relying upon IME Schlageter's opinions. When he testified, he gave in again and said, yes, her current condition, I think, was related to an attack. They didn't give in, start paying benefits or providing treatment, which means they were never relying on Schlageter. They send her off to IME Landry years later. Landry says, my client's still suffering from psych consequences from the attack. The commission agreed that, and I think cited that in their decision. They didn't back up and pay benefits or provide any treatment, meaning they were never relying upon Landry's denials. Then they failed to authorize and provide treatment. Landry said she needed more treatment. And then Landry on cross-examination ultimately said, I have no opinions on causation. That didn't cause them to back up and start paying benefits or authorize treatment. I mean, they weren't relying on these IMEs to deny treatment. And they also had Landry comment on the professional practice standards of two professions she was not a part of. It's ridiculous. I've never seen this, but it really goes to her credibility, I think, but it was crazy. So we also have the unusual event where they're filing lawsuits, a discovery lawsuit, a respondent and discovery lawsuit in Cook County under the guise that they were originally going in to get a subpoena enforced, an enforceable subpoena from Kane County. They went and filed in Cook County. They did it through a respondent and discovery action that was off the walls unusual. And that's their case law. They're verifying that penalties are warranted against personal injury lawyers who misuse a respondent and discovery vehicle. In this case, they have a discovery action. And they also asked the Cook County judge, please limit what proofs can go in at the commission. Well, this judge wasn't involved in the commission proceedings. He wasn't properly brought into the case with the filing. It should have been filed in Kane County, and he really had no authority to interfere with what the commission was doing in the processing of just the trial. We haven't even tried the case at that point. And that's actually at the point that the other attorney, the attorney before me withdrew from the case because there's just, when you're faced with a lot of obstruction and a streporous behavior, it's difficult to process and push these cases. So that's why they drag out for so long. So in any event, I've laid out in detail why this respondent and discovery voyage into Cook County was really off the charts. And then we've got just this whole series of frivolous motions filed by my opponent at the commission. I itemized them all in the table of contents and explain why they are not authorized by the law or by the rules. And finally, and I think this is really serious. We have relentless digging for personal health information, psych treatment of non-parties. Which of your, which of the other family members are treating with you, Dr. Fortan? You know, Ms. Spencer, which of your daughters is getting psych treatment? Was your mother, you know, did she have these cycle? You know, it's really over the top. So I'm asking, and I know you know the standards for all these legal concepts and all these different issues, but this is quite a course of conduct, which I've never seen before in a case or never been subjected to. And my poor client is the one who really was victimized by this. So I'm asking that you reverse the circuit court's reversal of the commission and reinstate the unanimous commission decision on accident and causation. I think we proved up permanent total disability as a matter of law. So I'm asking that you change the permanency award to PTV. And then finally, penalties and fees, I think have to be applied when something is this wild in the defense of the case. So respectfully, please provide that relief to Ms. Spencer and in this one decade, almost decade long ordeal. Thank you. Thank you, Mr. Nierman. Questions from the court? You'll have time in reply. Thank you. Mr. Newman, you may respond. Good morning, your honors. Good morning, justices of the appellate court. My name is Robert Newman for the appellee, Illinois Central School Bus LLC. For the appellee, we're asking this court to please affirm the decision of the circuit court of Kane County, Judge Bush. Judge Bush had reversed the award of the Illinois Workers' Compensation Commission, and he reinstated the award and decision of arbitrator Gerald Granada. Arbitrator Granada found that the claimant failed to prove she had an accidental injury that had arisen out of and in the course of her employment. Now, the claimant, Lynn Spencer, was a school bus driver for Illinois Central School Bus LLC at their St. Charles Yard. The question in this litigation has been about what happened on February 20, 2015, about 5.30 in the morning. The claimant says she was aboard her bus, preparing for her route that day and doing a pre-route inspection of her bus. She alleges she was struck while on the bus by an unknown person or unknown thing. She suspects a vagrant was on the bus, but she did not actually see anyone who hit her. She did not actually hear anyone coming towards her, and she did not smell anything on the bus that would have alerted her to anyone having been there. That's at C-248. If we step back in time for about two hours before the claimant arrived at the bus depot, the employer had a crew of cold starters. These are diesel buses, so on cold mornings they have other workers come in early to start the buses and make sure they'll be started for the drivers when they come in about 5.30. So these other employees start each bus in turn, allow each bus to warm up for a while. While they go on and turn on the other buses, and then they return to turn off the buses that have been on for a while. There are about 180 buses in this yard. There were four cold starters on this day. The cold starting was done between 3.30 and approximately 4.30 in the morning. Warren Markham was one of the cold starters. His testimony is at C-1234 to C-1279. Now, whenever a bus engine is turned on, that starts a DVR recording. And the recording goes on while, first of all, I should mention there is a lag of about five minutes between the start of the engine and the start of the recording, but the recording continues for the rest of the time the engine is on and then continues for 45 minutes after the engine is turned off. That was explained by Mechanic Jors at C-154, C-162, C-280, and C-295. So let me stop you for a moment. Where was the recording that was in question in this case, it was viewed by someone there at the office and the police, is that correct? It was viewed by the Mechanic Jors and the police officer Grove. And what did the officer and the mechanic observe on the video? They observed that they saw the cold starters on the bus. Now, that's consistent because once the first cold starter started the bus, the DVR would come on, they would see the second cold starter come to turn off the bus. They marked that it was plural cold starters. That's consistent with this other cold starter, Warren Markham, whose testimony was that after Ms. Spencer reported being hit, he went aboard the bus on direction from his manager and he searched to find out. Okay, but that's after the video would have stopped, right? No, because if Ms. Spencer started the video again, that would start again. Okay, so then the media that was observed by the police officer and the mechanic saw Markham and another cold starter go onto the bus after the incident? Well, they said they saw cold starters plural. So that would account for one cold starter to turn off the bus and Markham, who was there to inspect after. And they also saw themselves. They saw themselves. They saw Jors come on the bus to inspect and they saw Grove come on the bus to inspect. Okay, and where was the video? I mean, how was the video preserved? Well, it wasn't because... And so where did the officer and the mechanic view the video? Was it there on the bus or did they take the hard drive out and go into an office to observe that on a computer? They were on the bus. Mr. Jors brought a laptop on the bus and he connected it to the DVR on the bus so they could view it while they were on the bus. I see. And is that... I'm assuming that if they're able to connect the hard drive to the laptop while on the bus, they could also record that video if they needed to. There may have been a way. Mr. Jors didn't realize he was supposed to preserve it. Wasn't there a testimony that the officer was told by the company that the video would be retained or preserved? Well, it was the opposite way. Officer Grove asked Mr. Garcia, the manager, to preserve the video in some way. And apparently Mr. Garcia never told Jeff Jors to do it and Jeff Jors never had the order to do it. So he didn't try to save it to another media. Okay. The two employees who went on to the bus after the incident, one to turn the bus off and the other one to investigate or search, they were searching for an assailant. Is that correct? Well, let me just correct that. The first cold starter who would have been seen on the video would have been there before Lynn and Spencer. Right. And I'm talking about the ones afterwards because there's no indication that when they went on the bus the first time that anyone inspected, you know, didn't walk to the back of the bus and check anything. It was they just went on to turn on the bus because they had 180 buses to turn on. Is that correct? Yeah. And then they went back to turn it off. Right. And at that time when they went back to turn it off, that was after the incident, correct? No, I think they went back to turn off the bus before Lynn got there. Gotcha. And there were two of them that went to turn it off? Probably just one. Okay. One person to turn the key. Right. And that individual didn't inspect the bus. He just went on to turn it off because he had 180 buses to turn off. Correct? Well, yeah, he had 180 divided by four because there's four cold starters. But anyways, yes, he had a lot of buses to turn off. Okay, but I'm referring to when the two employees went on to the bus after the incident. I believe you stated that and in your brief, it suggests that one of them was there to turn the bus off and the other one inspected the bus in light of being told there was an assailant. Well, that's not exactly what I was trying to get at. Actually, there were three people that went on the bus after. Well, let's. Marshall went on and he inspected, but there was two other employees. Is that correct? Let me explain. Okay, there was Warren Markham. Warren Markham said that he went on the bus on instructions from Mr. Garcia to sweep the buses, his term, basically to look on the bus and see if there was a vagrant and then inspect the bus. So that was after the occurrence. That was Warren Markham who did that. He went with another man called Mike. He said Mike didn't go on the bus, but he, Mr. Markham, did go on the bus and he inspected it. He couldn't find a vagrant. He couldn't find any evidence of a vagrant. There was another man named Mr. Randy Brown. Randy Brown was the lot man. As the lot man, his job is to fill up the buses with fuel and clean them up and do minor maintenance. He's in the lot all day, basically. That's why he's the lot man. Okay, so when Miss Spencer reported this occurrence to the dispatcher, Cortez, she was actually in her own car. She wasn't on the bus. He, Cortez, found the claimant in her own car in front of the building, not around the back where the buses are. But the claimant then walked into the building, assisted by another employee or two. But on the way, she told this man, Randy Brown, the lot man, which bus it was that she claimed she was struck on and pointed that out to Randy Brown. Randy Brown ran over there, and he looked, and he couldn't find a vagrant. He wasn't sure that he totally went inside the bus, but he was searching around. He testified, though, at one point that he did go on the bus, right? Yeah, he, yes. Then he changed that testimony to not being sure if he went on the bus? That's right. He wasn't sure if he actually went on the bus or if he opened the door and looked through. But he didn't find a vagrant, and he didn't find any urine. And it would have been hard to find urine, though, arguably, if he didn't actually enter the bus. Exactly. So I agree with that. But at the same time, Gerald Marshall, the guy, the only guy who says he did find the urine, was very specific that he says he found the urine with Randy Brown. Okay. Randy Brown says, no, that didn't happen. Randy Brown did not find any urine. Randy Brown would have been the guy who had to clean it up if there was any, and Randy was sure that didn't happen. That's at C1327 in the record. So Randy Brown refuted Mr. Marshall. Okay. And then another person— The commission would have had to make a determination of who to believe in that situation. Yes, and that's my point, that the commission didn't make a determination who to believe because they totally ignored everything that Randy said. They totally ignored everything that Jeff Juris said. They totally ignored everything that was in that police report by Officer Grove. The other people that looked aboard the bus to see if there was anything out of the ordinary were Jeff Juris. He went on board the bus after the alleged attack. And Jeff Juris testified that after the alleged attack, Randy Brown was the guy who told him at about 530 about Lynn Spencer saying that she had been attacked. Okay, so Jeff Juris got in a pickup truck and he drove around the whole yard to see if he could find whoever had attacked Lynn. He couldn't find anybody. He went on foot to see if he could find anybody on the bus, around the bus. Then he went on the bus by himself and he looked around. He couldn't find anything out of the ordinary. He couldn't find any evidence of anybody having been there. So then he went in the building and he met Officer Grove, got the laptop. Grove and Juris went out and that's when they looked at the DVR, what was recorded on the DVR. They couldn't find any evidence that somebody was on there. Now, if somebody had been sleeping there overnight, they should have seen him on that video with 45 minutes of video recording. Or the culprit, whoever it was, should have encountered one of the cold starters. So, no, I think the manifest way of the evidence in this case, you have to look, if you would look at the testimony of Officer Grove, his report was the record by the claimant. It's PX7 at C552. There was no evidence of a culprit being there. If you look at Jura's testimony, Randy Brown's testimony, and Markham's testimony, there was a diligent search. There was no finding of any culprit on the bus. And Ms. Spencer's testimony, in some ways, was contradictory to herself, because at some elements of her testimony, she said, well, in her testimony, she said she was reaching for the inspection pad, then turning to turn on the engine. She was struck. In her testimony, she was standing by her seat. In her testimony, she had not turned on the key to the engine before being hit. That's at C213 and 214. Yet to the opposite, she reported that she had turned on the engine before being hit and was bending forward to turn off the light. So the story changes. And this is right after she allegedly was conked on the back of the head, right? Yes. Yes, she talked to the officer that same morning. There was an assertion that, you know, maybe she was injured off-premises and drove herself on to the premises. And that's when the lot man saw her pull up to the building. How far from the building where she parked to go in and report, you know, she needed help to go in to report the attack? How far from that spot to her bus? How much distance was there between the bus and the building? Okay. Randy did exhibit 20, response exhibit 20 or 21. I'm not sure which it was. But we had a picture from above and Randy showed where the bus was. And it was like the second. It was in the second slot in one of the middle roads, one of the two. Can you give an estimate in yardage or feet or anything of that nature? I mean, the best I can do from looking at that was there was about maybe 40 yards from the building to the bus. But the thing is that's in the back where they found her in her car was in the front. So the distance from where they found her to the bus, you've got to consider the building was between them. So if you were, you know, talking about walking distance, you'd have to walk around the building and then to the back of the building and then another 40 yards or so to get to the bus. I don't know if that answers your question. Yeah, I was just trying to determine whether she, it was reasonable for her if she had been attacked on the bus to get in her vehicle, which was apparently a lot. Allegedly, it was parked near the bus and then drive around to the front of the building where the entrance was for her to walk in and report this. Or if it would have been more logical for her to just take off running or walking from the bus directly to the building. Well, how about just using the radio? Because there was a radio on the bus. Well, if you had just been attacked on the bus, you may not want to stay on it to do anything further. You may want to extricate yourself from that situation. I'm just assuming, of course, but to reply to your suggestion. Okay, understood. No, I don't think it makes much sense for her to get in her car and drive around. There's a lot of people there. If she was dizzy or dazed, it doesn't make much sense for her to get in her car and drive around the building when there's a crowd. There's other people there. There's 180 other drivers doing the same thing as she's doing. Not necessarily at the same moment, but there were a number of people around. And for her to get in her car and drive in that situation, it doesn't really make much sense. No. Okay, thank you. Your time is up, Mr. Newman. Any questions, further questions from the court? No. Okay, Mr. Newman, you may reply. Thank you, Justice. So a lot of what counsel just presented to you is based upon inferences from the circumstantial evidence. Mr. Marshall is still employed by Illinois Central Bus. He's the only one that got reports of the accidents. The only one investigated the accidents. He did what he normally does, and he goes out looking for stuff. He finds the liquid urine on the floor. He thought a guy named Randy came with him. He didn't say Roundy Brown, like counsel just told you, but he thought Randy came with him. And you're exactly right, Justice Barberis. Randy Brown, by the time he was done with cross-examination, he didn't recall getting on the bus. He didn't recall looking through the door windows or the windows. So there's no way he would have found any urine on there. So Marshall was their witness. It's an admission against their interest. The DVR itself, they represented that they would save this DVR for the police. And they had the ability to do it. There's no testimony from jurors that he wasn't told not to do it. He just didn't know that there was an agreement between Cortez and the police to preserve it, apparently. Yes, they could have preserved it. They didn't. They destroyed it. That shouldn't be held against my client, because parties that make evidence go missing are usually the ones that receive the consequence of that type of event. So the DVR shouldn't even be considered as far as I'm concerned. But even if the starters went in that morning, and we don't know that for sure, because they're all over the place on their starter story, they had two starters at best. Sometimes they had no starters, and it really depended on who was available and what the weather was like as to whether or not they were going to start buses. We don't know who was out there, because Markham, who wrote the little note saying, I started the bus, his little note had the wrong date of accident. He had the wrong year on the thing. And he disavowed everything that he put in the note. So he admitted by the end of his testimony, I don't know if I went onto a bus. I can't tell you I started. I don't know if I turned it off. Plus, her bus was located 800 yards away, which is what? Eight football fields away, which doesn't make any sense. I don't think their lot is that big. But that's what the Markham, the starter specialist that they had presented. So she testified that she always drove her car up to the bus. She was 74 at that point, or 75 at that point. She drove her car to the bus and parked in a certain location. And she would go on and do the pre-ride check, go back to the bus barn to Hobnob with the friends. And then they would go out for routes. This morning, she drove out there like she normally did. She comes out early because she's really conscientious. And it could be a snowy day out. She gets hit. She gets back in the car. I don't know. I don't know how we can question what she's doing at that point. Because if you get attacked, and you're small, and you're 74, and it's dark, and there's no real lights, and there's no security, and no one's around. I mean, I'm thinking I got to get out of there. And the fastest way to get out of there is get in the car and get out of there. So after she wakes up a couple of minutes after being knocked out, she drives around the front where Cortez is. She calls Cortez. Cortez comes down, the supervisor takes her in and debriefs her. It's a debriefing. And that's when everybody sees the hit to the head and all that kind of good stuff. So I think it's a nice, clean presentation. The DVR was destroyed. It shouldn't be held against my client. 10 years ago, she had this attack. She should have been paid. Even if the circuit court was right that it's more likely that she slipped on snow, which I disagree with, that's a compensable injury. She should have gotten benefits. Illinois Central was never intending to pay a dime to this poor person, nor pay any for pay any treatment. So I'm asking that you reverse circuit court decision. Reinstate the decision on the commission's unanimous decision on accident and causation. Give it a permanent total disability award. And the penalty thing is really interesting. I mean, it's really wild. So that's all I have for you, unless you have questions for me. Questions from the court? Thank you. I enjoyed seeing you all. Thank you. Okay. Well, thank you, counsel, both for your arguments in this matter. This morning, it will be taken under advisement. A written disposition shall issue. And at this time, the clerk of our court will escort you out of our remote courtroom. Have a good morning. Thank you.